**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

BEVERLY L. RUSSELL
                                        Plaintiff,
        v.                                                      No. 13-CV-1030
                                                                    (MAD/CFH)
CAROLYN W. COLVIN, Commissioner of
Social Security Administration,

                                        Defendant.
_____

**APPEARANCES:**                                  **OF COUNSEL:**

LEGAL SERVICES OF CENTRAL NEW              CHRISTOPHER CADIN, ESQ.
        YORK, INC.
Attorney for Plaintiff
472 South Salina Street
Suite 300
Syracuse, New York 13202

HON. RICHARD S. HARTUNIAN                   MONIKA K. CRAWFORD, ESQ.
United States Attorney for the                     Special Assistant United States Attorney
    Northern District of New York
Attorney for Defendant
Room 218
James T. Foley U.S. Courthouse
Albany, New York 12207

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

    Plaintiff Beverly L. Russell ("Russell") brings this action pursuant to 42 U.S.C. §

405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner") denying her application for benefits under the Social Security Act.

---

        [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

Russell moves for a finding of disability and the Commissioner cross-moves for a judgment on the pleadings. Dkt. Nos. 11, 14. For the reasons which follow, it is recommended that the Commissioner's decision be affirmed.

## I. Background

### A. Facts

Born on December 26, 1965, Russell was forty-one years old on the alleged disability onset date. T. 41, 142.[2] Russell graduated from high school and completed a year and a half of college. T. 42. Russell's previous work experience primarily included child care as a teacher's assistant, classroom aide, and day care center employee. T. 179. Russell alleges disability from a seizure disorder, depression, early Alzeheimers, a fractured left arm, and back pain. T. 148.

### B. Procedural History

On April 30, 2012, Russell protectively filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income claiming an alleged onset date of September 27, 2007. T. 68, 76, 120-32, 142-44. That application was denied on August 6, 2012. T. 84-89. Russell requested a hearing before an administrative law judge ("ALJ") and a hearing was held before ALJ Bruce S. Fein on December 5, 2012. T. 35-67, 90-91. In a decision dated January 25, 2013, the ALJ held that Russell was not entitled to disability benefits. T.

---

[2]"T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner. Docket No. 8.

10-21. Russell filed a timely request for review, and on June 28, 2013, the Appeals Council denied Russell's request, thus making the ALJ's findings the final decision of the Commissioner. T. 1-6, 33-34. This action followed.

## II. Discussion

### A. Standard of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. Berry, 675 F.2d at 467. Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)). However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998). If the Commissioner's finding is supported by substantial evidence, it is conclusive. 42 USC § 405(g) (2006); Halloran, 362 F.3d at 31.

## B.  Determination of Disability[3]

"Every individual who is under a disability shall be entitled to a disability. . . benefit. . . ." 42 U.S.C. § 423(a)(1) (2004).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  Id. § 423(d)(1)(A).  A medically determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience.  Id. § 423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience."  Ventura v. Barnhart, No. 04-CV-9018(NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based upon 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is

---

[3] While the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are identical, so that "decisions under these sections are cited interchangeably."  Donato v. Sec 'y of Health and Human Servs., 721 F.2d 414, 418 n. 3 (2d Cir.1983) (citation omitted).

currently engaged in substantial gainful activity. If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work. Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). The plaintiff bears the initial burden of proof to establish each of the first four steps. DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467). If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere. Id. at 1180 (citing Berry, 675 F.2d at 467).

## C. ALJ Fein's Findings

Russell, represented by an attorney, testified at the hearing held on December 5, 2012. T. 35-67 (transcript from the administrative hearing). Using the five-step disability sequential evaluation, the ALJ found that Russell (1) had not engaged in substantial gainful activity since September 27, 2007, the alleged onset date; (2) had the following severe medically determinable impairments: a seizure disorder,

depression, and anxiety; (3) did not have an impairment, alone or in combination, sufficient to meet the listed impairments in Appendix 1, Subpart P of Social Security Regulation Part 404; (4) maintains "the residual functional capacity [("RFC")] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)[4]," and thus, (5) remains capable of performing her past relevant work as an aide and generally employment which exists in significant numbers in the national economy. Therefore, a determination of not disabled was made.

### D. Russell's Contentions

Russell contends that the ALJ erred in (1) failing to find that Russell's impairments met or medically equaled a listed impairment; and (2) concluding that substantial evidence in the record supported a finding that Russell retained sufficient residual functional capacity (RFC) to perform work. Specifically Russell alleges that the ALJ did not properly evaluate the medical evidence or her credibility when determining her RFC,

---

[4]

> Light work involves lifting no more than [twenty] pounds at a time with frequent lifting or carrying of objects weighing up to [ten] pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking . . . or when it involves sitting most of the time with some pushing and pulling of arm or leg controls . . . If someone can do light work, . . . he or she can also do sedentary work, unless there are additional limiting factors such as a loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b). "[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time." Social Security Ruling ("SSR") 83-10 at *6.

or correctly conclude that Russell could perform work that existed in significant numbers in the national economy.

## 1. Severity

Russell contends that the ALJ failed to properly assess the severity of her conditions in conjunction with one another. Specifically, Russell states that, per the opinion of her treating physician, the ALJ should have determined that her seizure disorder was sufficient to satisfy the criteria outlined in Listing 11.03. Pl. Memorandum of Law (Dkt. No. 11) at 20 (citing T. 461).

As discussed above, step two of the sequential evaluation process requires a determination whether the claimant has a severe impairment which significantly limits the physical or mental ability to do basic work activities. See subsection IV(A) supra; 20 C.F.R. § 404.1521(a) (2003). Where a claimant alleges multiple impairments, the court will consider "the combined effect of all [] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." Id. § 404.1523. An impairment, or combination thereof, is not severe if it does not impinge on one's "abilities and aptitudes necessary to do most jobs." Id. § 404.1521. Basic work activities which are relevant for evaluating the severity of a physical impairment include "physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling. . . ." Id. § 404.1521(b)(1).

"The Social Security regulations list certain impairments, any of which is sufficient, at step three, to create an irrebuttable presumption of disability." DeChirico, 134 F.3d at 1180; see also 20 C.F.R. § 404.1520(d) (2003); Id. at pt. 404, subpt. P. App. 1

(2003)(listing of per se disabling ailments).  Additionally, the regulations state that "if an individual has an impairment that is 'equal to' a listed impairment," that individual is disabled regardless of his or her age, education, or work experience.  DeChirico, 134 F.3d at 1180 (quoting 20 C.F.R. § 404.1520(d) (2003)).

Listing 11.03, for non-convulsive epilepsy, establishes a per se disability for "petit mal, psychomotor or focal [seizures] . . . documented by detailed description of a typical seizure pattern . . . occurring more frequently than once weekly in spite of at least [three (]3[)] months of prescribed treatment."  20 C.F.R. pt 404, subpt P, App. 1 § 11.03. Treating physician John Plyman, MD indicated that Russell meet the requirements for this listing per her multiple emergency room ("ER") visits.  T. 461.  The ALJ determined that the requirements for 11.03, specifically having a seizure more frequently than once a week, were not met.  T. 14.

The ALJ indicated that Russell had received treatment for seizures on July 17, 2009; April 14, 2010; July 23, 2010; February 3, 2011; April 6, 2011; April 27, 2011; June 3, 2011; August 3, 2011; November 10, 2011; November 15, 2011; December 16, 2011; January 17, 2012; January 26, 2012; February 20, 2012; March 4, 2012; March 12, 2012; April 19, 2012; May 15, 2012; May 20, 2012; May 31, 2012; and July 2, 2012. T. 14.  Upon reviewing the medical records, not just for the reason for treatment but for the dialogue of Russell's health status, the undersigned found that the dates cited by the ALJ were overwhelmingly correct; however, Russell reported a few additional instances of seizure activity.  These additional occurrences were on February 10, 2010; May 16, 2010; June 30, 2010; twice in the week before August 24, 2011; August 24, 2011; September 14, 2011; September 26, 2011; October 1, 2011; October 4, 2011;

8

October 5, 2011; March 19, 2012; May 4, 2012; May 22, 2012; July 14, 2012; August 3, 2012; September 11, 2012; and November 12, 2012.  T. 219, 316, 322, 474-78, 491, 499, 504, 527, 533-34, 542, 551, 566.

Russell did not start having several seizures a year until 2011.  Even then, the frequency with which she had seizures was insufficient to meet the listings.  In 2011, Russell had two seizures in February, two seizures in April, one seizure in May, four seizures in June, eight seizures between four days in August, three seizures between two days in September, three seizures in October, three seizures in November, and one in December.  T. 235, 400, 408, 412, 416, 422, 426, 432, 443, 527, 533-34, 536, 542, 551, 566.  There is no pattern in 2011 whereupon Russell's seizures occurred more frequently than once weekly in spite of at least three months of prescribed treatment.  Moreover, there were multiple entries during this time of Russell's noncompliance with her medications, which was reported by herself and her family, further illustrated by her low medication levels.  T. 235 (Russell reports not taking her medication in December for a period of time because she needs a refill), 416 (Russell reports she ran out of medication and feels as though a seizure is coming on in July), 432 (family reports non-compliance in April), 542 (doctor notes non-compliance in June), 566 (notes non-compliance in February, as well as doctor's suspicions that Russell is not taking her medication).

The same holds true in 2012.  Russell experienced two seizures in January, one in February, three in March, four in May, four on the same day in July, one in August, one in September, and one in November.  T. 219, 225, 230, 316, 322, 328, 364, 370, 382, 390, 394, 474-78, 491, 499, 504.  Russell's gross non-compliance and low medication

9

levels in her bloodstream were recorded in February.  T. 390.  Russell also reported that she stopped taking her medication in July and felt as though a seizure was going to happen.  T. 322.  Accordingly, for the same reasons stated above, Russell also failed to establish a regular patter in 2012 whereupon her seizures occurred more frequently than once weekly in spite of at least three months of prescribed treatment.

There is nothing else in the record, including the statements of Russell's family members, which would indicate that her seizures happened more frequently.  Russell's family described what her seizures looked like, but did not indicate their frequency.  T. 185, 188-89.  Further, Russell herself only reported having seizures three or four times a month, which is insufficient to satisfy the Listings.  T. 45 (testified to such at the hearing), 203 (reported having "about three or four [seizures] per month to Dr. Marasigan in October of 2011).  Additionally, the objective medical evidence also shows fairly benign results, with unremarkable CT scans in April of 2010 (T. 241) and May of 2012 (T. 250), EEGs in October of 2011 (T. 408) and May of 2012 (T. 261, 313), and an EKG in November of 2011 (T. 205).

Therefore, substantial evidence supports the ALJ's determination that Russell's condition did not meet the Listings in spite of the document submitted by her treating physician.  Accordingly, the ALJ's decision should be affirmed.

## 2. RFC

The ALJ determined that Russell retained the RFC to perform light work.  T. 18-19. Specifically, the ALJ concluded that Russell

is able to carry twenty pounds occasionally and ten pounds

frequently, stand and/or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday. [Russell] must avoid exposure to unprotected heights and moving mechanical parts. Additionally, [Russell] retains that ability to engage in unskilled work because she is able to (on a sustained basis) frequently understand, carry out, and remember simple instructions and directions, frequently respond appropriately to supervision, co-workers, and usual work situations, and frequently deal with changes in a routine work setting. This [RFC] encompasses the moderate limitations in the concentration, persistence, and pace component of the B criteria discussed above because [Russell] has been limited to simple unskilled work.

T. 18. In determining as much, the ALJ gave

significant weight to the opinions of Dr. Ganesh and Dr. Nobel due to their programmatic expertise and consistency . . . with the longitudinal medical evidence . . .[;] reduced weight to the medical source statement completed by Dr. Pylman because it is not consistent with the overall evidence, and because some of [the] . . . opinions contradict one another . . . [;] minimal weight to the medical source statement completed by the . . . consultative examiner because . . . none of the symptoms that were reported . . . were identified in the hospital reports . . .[; and] no evidentiary weight to the written third-party statements because they are from interested parties; however, these statements were considered as part of the overall record, including [Russell's] allegations and credibility.

T. 18.

RFC describes what a claimant is capable of doing despite his or her impairments

considering all relevant evidence, which consists of physical limitations, symptoms, and

other limitations beyond the symptoms. Martone v. Apfel, 70 F. Supp. 2d 145,150

(N.D.N.Y. 1999); 20 C.F.R. §§ 404.1545, 416.945. "In assessing RFC, the ALJ's

findings must specify the functions plaintiff is capable of performing; conclusory

statements regarding plaintiff's capacities are not sufficient." Martone, 70 F. Supp. 2d

at 150. RFC is then used to determine whether the claimant can perform his or her

past relevant work in the national economy. <u>New York v. Sullivan</u>, 906 F.2d 910, 913 (2d Cir. 1990); 20 C.F.R. §§ 404.1545, 416.960 (2003). The Second Circuit has clarified that, in Step 5 of the Commissioner's analysis, once RFC has been determined "the Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's [RFC]." <u>Pourpre v. Astrue</u>, 566 F.3d 303, 306 (2d Cir. 2009).

> Each finding as to the plaintiff's functional abilities must be supported by substantial evidence because conclusory statements regarding plaintiff's capacities are not sufficient . . . Only after the ALJ has described the plaintiff's capabilities on a function-by-function basis supported by substantial evidence may RFC then be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

<u>DiVetro v. Comm'r of Soc. Sec.</u>, No. 05-CV-830 (GLS/DEP), 2008 WL 3930032, at *2 (N.D.N.Y. Aug. 21, 2008) (internal quotation marks and citations omitted). For the reasons explained <u>infra</u>, the ALJ's RFC decision is supported by substantial evidence and should be affirmed.

### i. Consultative Examiners

### a. Dr. Ganesh

The ALJ's decision to give significant weight to Dr. Ganesh's medical opinion is supported by substantial evidence. Dr. Ganesh noted that Russell's prognosis was stable but guarded, that she had no gross physical limitations and, due to her seizures, should avoid activities involving driving, heights, being around machinery, and swimming. T. 59. This opinion is supported by the longitudinal medical evidence which

showed a general absence of any neurological or musculoskeletal abnormalities.  T.

201, 238, 371, 383, 395, 401, 433, 442, 448, 454, 501, 507-08, 511, 519, 522, 525-26,

528, 531, 534, 537, 540, 543, 546, 549.  This is also supported by the benign

diagnositic tests listed supra.

   The opinions of consultative examiners like Dr. Ganesh may constitute substantial

evidence where, as here, it is supported by the medical evidence in the record.

> It is well settled that an ALJ is entitled to rely upon the
> opinions of both examining and non-examining State agency
> medical consults, since such consultants are deemed to be
> qualified experts in the field of social security disability.
> Such reliance is particularly appropriate where . . . the
> opinions of these . . . State agency medical consultants are
> supported by the weight of the evidence.

See Fiozzo v. Barnhart, No. 05-CV-561 (LEK/VEB), 2011 WL 677297, at *8 (N.D.N.Y.

Jan. 19, 2011) (citations omitted); see also Diaz v. Shalala, 59 F.3d 307, 313 n.5 (2d

Cir. 1995) (explaining that "the opinions of nonexamining sources [can] override treating

sources' opinions provided they are supported by evidence in the record.") (citations

omitted); McEaney v. Comm. of Soc. Sec., 536 F. Supp. 2d 252, 256 (N.D.N.Y. 2008)

("the evaluations of non-examining State agency medical and psychological consultants

may constitute substantial evidence . . . An ALJ must treat such evaluations as expert

opinion evidence of non-examining sources . . . This treatment extends to . . . RFC

assessments [because] . . . [s]tate agency consultants are experts in evaluating the

medical issues of disability claims.") (citations omitted).  Accordingly, for the reasons

cited above, the ALJ's decision to accord Dr. Ganesh's opinion significant weight and

incorporate those physical functional limitations into his RFC assessment is

appropriate.

**b. Dr. Caldwell**

Conversely, the ALJ accorded minimal weight to Dr. Caldwell's medical source statement as the symptoms that were reported by Russell in that instance were reported no where else in the medical record. T. 18. Russell contends that this characterization by the ALJ is inaccurate. Pl. Memorandum of Law at 17.

Dr. Caldwell noted that Russell reported crying spells, hopelessness, depression, diminished pleasure and self-esteem, fatigue, loss of energy, and withdrawal. T. 252. Russell also stated that she sometimes thought about harming herself either by jumping off a building or stabbing herself with a knife and reported auditory and visual hallucinations. T. 253. Russell also contended she had short term memory deficits; difficulties with concentration, organization and planning; and an inability to learn new material. Id. Dr. Caldwell ultimately concluded that Russell was limited in her ability to follow and understand simple directions; perform simple or complex tasks; maintain attention, concentration, and a regular schedule; learn new tasks; make appropriate decisions and deal with stress; and relate with others. T. 54-55. Russell was then taken to the hospital for a psychological evaluation. T. 55.

Russell's presentation with Dr. Caldwell was not repeated elsewhere in the record, as properly noted by the ALJ. Conversely, prior to the examination with Dr. Caldwell, Russell was generally noted as being fully oriented, with intact memory, normal insight and judgment, and appropriate mood and affect. T. 233 (specifically in January of 2012 denying depression, mood swings, suicidal or homicidal thoughts or hallucinations, or anxiety), 238, 371, 383, 395, 401, 433, 448, 454, 508, 511, 517, 519, 522, 525-26, 528, 535 (while insight was poor, judgment was normal, affect and mood were appropriate

and memory was intact), 540 (while insight was noted to be poor, judgment was normal, affect and mood were appropriate and memory was intact), 543, 546, 549, 567 (while insight, judgment and attention were all categorized as poor, Russell specifically denying hallucinations). These notations remained the same after the consultative examination as well, with the exception of a visit in October of 2012. T. 317 (additional comments stated that Russell was not a risk to herself or others and did not suffer from hallucinations or other psychotic thoughts), 323, 349, 483 (noting in October of 2012 that Russell was fully oriented, with appropriate mood and affect though poor insight and judgment; Russell reported being sad and depressed but refused to go get mental health treatment and discussed various coping mechanisms), 493. Following her October 2012 doctor's appointment, Russell received a psychological evaluation with Michael Pratts. T. 352-60. The results of that evaluation presented far different and less severe conclusions than those proffered by Dr. Caldwell, whereupon it was noted that Russell would not go through with any alleged threats of harm and that she further denied any delusions or suicidal ideations. T. 354. These results are similar to those obtained from the psychological evaluation immediately following Dr. Caldwell's examination. Within four days, Russell reported that she no longer had any urges to harm herself or others and her thought process, judgment and insight were all noted to be within normal limits and her memory and mood intact and normal. T. 332-33. The Second Circuit has determined that the Commissioner "is entitled to rely not only on what the record says, but also on what it does not say." Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983) (citations omitted). Thus, given Russell's frequent contact with the emergency department and the lack of notations regarding such psychological

systems, it is appropriate to conclude that Russell was not suffering in the way that she now represents. Accordingly, substantial evidence in the medical record supports the ALJ's decision to accord Dr. Caldwell's opinion little weight.

This longitudinal medical evidence is also consistent with the mental RFC completed by consultative examiner Dr. Nobel. T. 283-301. Dr. Nobel concluded that Russell was not significantly limited in her ability to remember short and simple instructions, maintain attention and concentration for extended periods, perform activities within a schedule, sustain an ordinary routine without special supervision, and work in coordination and proximity with other. T. 297. Ultimately, Dr. Nobel concluded that "given [Russell's] presentation at St. Joseph's and the lack of any longitudinal h[istory] of significant psych[iatric] s[ymptoms] the credibility of her statements seems to be in question [and the o]verall evidence suggests [that Russell] . . . is capable of at least simple task work . . . ." T. 99. As outlined above, the opinions of a consultative examiner, when supported by the medical evidence, represent substantial evidence supporting a RFC determination. See Section II(D)(2)(i)(a). Therefore, the ALJ's decision should be affirmed.

To the extent that Russell contends otherwise, namely that her symptoms were noted throughout the medical record, such claims are disingenuous. The vast majority of Russell's citations regarding her suicidal thoughts and hallucinations are to records from June 4, 2012, the date of the consultative exam with Dr. Caldwell. Compare Pl. Memorandum of Law at 17 with T. 252-60, 266-82, 332-44. Further, the characterization of the other cited records outlining her alleged depressive symptoms seems inaccurate. Even to the extent that there is other evidence in the record which

would support the contentions that Russell did, sporadically, allege that she suffered from psychological ailments, such evidence is also unavailing. As previously discussed, "[t]he reviewing court may not . . . second guess the Commissioner's decision even if it might justifiably have reached a different result upon a <u>de novo</u> review," if substantial evidence adequate to support a conclusion of disability is present. <u>Morales ex rel. Morales v. Barnhart</u>, 218 F. Supp. 2d 450, 458 (S.D.N.Y. 2002) (citations omitted). Thus, even if there were some entries where Russell complained of fatigue, depression, loss of appetite and the like, for the reasons stated above, there was another greater body of evidence which was sufficient to conclude that she did not. Accordingly, the determination of the ALJ should be affirmed.

### ii. Treating Physician Dr. Plyman

Dr. Plyman was one of Russell's treating physicians. When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant. <u>Harris v. R.R. Ret. Bd.</u>, 948 F.2d 123, 126 (2d Cir. 1991). Generally, more weight is given to a treating source. Under the regulations, a treating source's opinion is entitled to controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2) (2005); <u>Shaw</u>, 221 F.3d at 134. Before a treating physician's opinion can be discounted, the ALJ must provide "good reasons." <u>Schaal v. Apfel</u>, 134 F.3d 496, 505 (2d Cir. 1998).

The ALJ gave Dr. Plyman's medical source statement reduced weight because it

was both internally inconsistent as well as inconsistent with the medical evidence as a whole.  T. 18.  Russell contends that the ALJ should have recontacted Dr. Plyman to explain any of the inconsistencies in the medical source statement which he completed.  Pl. Memorandum of Law at 23-24.

An ALJ has an affirmative duty to develop the administrative record during Social Security hearings, even when the claimant is, as in this case, represented by counsel.  See Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) (citations omitted); see also 20 C.F.R. § 404.1512(d) (describing Commissioner's duty to develop a "complete medical history for at least the [twelve] months preceding the month in which [claimant] file[s an] application . . . ."); 20 C.F.R. § 404.1512(e)(explaining how the Commissioner will attempt to retrieve the entire medical history from claimant's treating sources as opposed to always seeking consultative examinations).  Accordingly, "[t]he ALJ's duty to supplement a claimant's record is triggered by ambiguous evidence, the ALJ's finding that the record is inadequate or the ALJ's reliance on an expert's conclusion that the evidence is ambiguous."  Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005) (citations omitted); see also Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.") (citations omitted); Roat v. Barnhart, 717 F. Supp. 2d 241, 264 (N.D.N.Y. 2010) (holding that where a "medical record paints an incomplete picture of [claimant's] overall health during the relevant period, as it includes evidence of the problems, the ALJ had an affirmative duty to supplement the medical record, to the extent it was incomplete, before rejecting

18

[claimant's] petition.") (internal quotation marks and citations omitted). "This duty to recontact applies to internal inconsistencies within an actual report or opinion, not just to inadequacy of the record as a whole." Hall v. Astrue, 677 F. Supp. 2d 617, 626 (W.D.N.Y. 2009) (citations omitted). Specifically, when discussed in the context of a treating physician, the inquiry has revolved around the quality of the records which have been provided to the ALJ for review. See Moore v. Astrue, No. 11-CV-952 (TJM/CFH), 2013 WL 935855, at *4-*5 (N.D.N.Y. Feb. 5, 2013).

> [I]t is not sufficient for the ALJ simply to secure raw data from the treating physician. What is valuable about the perspective of the treating physician . . . is his opportunity to develop an informed opinion as to the physical status of a patient. To obtain from a treating physician nothing more than charts and laboratory test results is to undermine the distinctive quality of the treating physician that makes his evidence so much more reliable than that of an examining physician who sees the claimant once and who performs the same tests and studies as the treating physician.

Peed v. Sullivan, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991).

During a medical report in September of 2012, Dr. Pylman opined that Russell had no limitations in her ability to sit, see, hear, and speak (being able to perform such tasks more than four hours per workday) and was moderately limited in her ability to walk and stand (being able to perform such tasks up to four hours per workday). T. 486. These were later memorialized in his medical source statement. T. 462-65. These findings are consistent with the longitudinal medical record as well as the ability to perform light work, as noted supra.

In that report, Dr. Plyman also said that Russell was very limited in her ability to, amongst other things, lift or carry objects. T. 86. However, Dr. Plyman later stated

in the medical source statement that Russell could never lift or carry ten pounds, occasionally lift and carry eleven to twenty pounds, frequently lift or carry twenty-one to fifty pounds, and continuously lift or carry fifty-one to one hundred pounds. T. 462. This is grossly inconsistent with Dr. Plyman's previous statements.

Thus, the question posed is whether the information provided by the treating source as a whole was adequate, whether it was consistent with the medical record, and whether there was good reason to deny the treating physician, or his report, controlling weight. As previously noted, the record is extensive and unabridged and thus provides a complete picture of the treatment which Russell received throughout 2011 and 2012. That evidence includes benign diagnostic exams and generally unremarkable neurological and musculoskeletal findings. Identical findings are also memorialized in Plyman's own treatment notes with Russell in 2011 and early 2012. See T. 542-43 (records from July 7, 2011 noting "mildly impaired short term memory," but otherwise normal orientation, range of motion, muscle strength, insight, judgment, mood and affect), T. 539-41 (notes from July 14, 2011 indicating non compliance with medication, normal range of motion and muscle strength, intact memory, full orientation to time, place and person, and poor insight with normal judgment), 527-29 (notes from September 21, 2011 noting normal musculoskeletal and neurological findings), 524-26 (notes from October 5, 2011 noting the same with additional comments of intact memory as well as normal insight and judgment and appropriate mood and affect), 499-502 (notes from May 22, 2012 indicating the same). In fact, in November of 2011, Dr. Plyman concluded that they were "[a]chieving fair control of [Russell's] symptoms." T. 519.

For the reasons outlined _supra_, Plyman's conclusions about Russell's physical limitations, with the exception on his conclusions regarding her ability to lift and carry weight, are supported by substantial evidence and thus are appropriate RFC limitations. Further, the body of treatment notes from Plyman presents an informed opinion which was consistent with the rest of the medical record and Dr. Ganesh's opinion, thus there was no need to re-contact Plyman. The inconsistency in the medical source statement, specifically the conclusions related to Russell's ability to lift and carry weight, represented a small outlier which did not render the medical record as a whole vague or inadequate. In the same vein, given the longitudinal medical record, the inconsistency in Plyman's medical source statement is an obvious abnormality; thus, this represents a good reason for not affording the treating physician's opinion, on that subject, controlling weight. Therefore, the ALJ's decision should be affirmed.

### iii. Third Party Statements

The ALJ "g[a]ve no evidentiary weight to the written third-party statements because they [we]re from interested parties; however, these statements were considered as part of the overall record, including [Russell's] allegations and credibility." T. 18. Russell contends that these statements should have been used with more care and accorded more weight when determining Russell's RFC. Pl. Memorandum of Law at 18-19. As previously discussed _supra_, there is substantial evidence in the record which supports the ALJ's RFC determination. Accordingly, the ALJ's decision should be affirmed.

### 3. Russell's Credibility

Russell contends that the ALJ erred by failing to consider Russell's disabling pain. It is the duty of the ALJ, "not the reviewing courts, to appraise witness credibility." <u>Carvey v. Astrue</u>, 380 Fed. Appx. 50, 53 (2d Cir. 2010) (citations omitted). The ALJ determines whether an ailment is an impairment based on a two-part test. First, the ALJ must decide, based upon objective medical evidence, whether "there [are] medical signs and laboratory findings which show . . . medical impairment(s) which could reasonably be expected to produce [such] pain. . . ." <u>Barringer v. Comm'r of Soc. Sec.</u>, 358 F. Supp. 2d 67, 81 (N.D.N.Y. 2005); 20 C.F.R. § 404.1529 (2003). This primary evaluation includes subjective complaints of pain. 20 C.F.R. § 404.1529 (2003). "'Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work.'" <u>Barringer</u>, 358 F. Supp. 2d at 81 (quoting <u>Crouch v. Comm'r of Soc. Sec. Admin.</u>, No. 6:01-CV-0899 (LEK/GJD), 2003 WL 22145644, at *10 (N.D.N.Y. Sept. 11, 2003).

An ALJ must consider all symptoms, including pain, and the extent to which these symptoms are consistent with the medical and other evidence. 20 C.F.R. § 404.1529 (2003). The claimant's credibility and motivation, as well as the medical evidence of impairment, are used to evaluate the true extent of the alleged pain and the degree to which it hampers the applicant's ability to engage in substantial gainful employment. <u>See</u> <u>Marcus v. Califano</u>, 615 F.2d 23, 27 (2d Cir. 1978). The ALJ must consider several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

> (i)  [The claimant's] daily activities;

(ii)  The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv)  The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;

(v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;

(vi) Any measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).

Here, the ALJ considered Russell's subjective allegations of pain and disability, but reasonably found that they were not fully credible.  T. 17.  In so finding the ALJ noted the unremarkable diagnostic testing results, Russell's non-compliance with her medications, and the fact that the symptoms relayed to Dr. Caldwell were not present anywhere else in the record.  T. 17.

For the reasons discussed supra, it has already been determined that substantial evidence supports the conclusion that Russell did not complain of mental health symptoms outside of her examination with Dr. Caldwell.  By extension, substantial evidence also supports the conclusion that Russell never sought nor received mental health treatment.  Further, the medical record, as discussed supra, is replete with notations from medical staff, Russell's family, and Russell herself outlining her non-

23

compliance with her prescribed seizure medication.

Russell's credibility is diminished by her failure to seek out treatment and non-compliance with her medication. <u>See</u> 20 C.F.R. § 404.1530 (b) (explaining that the failure to follow a prescribed treatment must be accompanied by a good reason). While "[c]ourts have observed that faulting a person with a diagnosed mental illness for failing to pursue mental health treatment is a questionable practice," the record does not indicate a diagnosed mental illness. <u>Cornell v. Astrue</u>, No. 11-CV-1064, 2013 WL 286279, at *8 (N.D.N.Y. Jan. 24, 2013) (citations omitted). Further, medical records indicate, as outlined <u>supra</u>, that Russell, despite her present contentions, had normal insight and judgment. Thus, there has been no good reason proffered by Russell as to why she failed to seek out treatment or follow her prescribed medication regime. Therefore, the ALJ reasonably determined that Russell's statements were not fully credible and his decision should be affirmed.

### 4. Step Four & Five of the Sequential Analysis

Russell contends that she "has significant limitations in the basic physical and mental demands of work; her pain and loss of consciousness substantially affect work at all levels." Pl. Memorandum of Law at 25. To the extent that Russell is re-alleging that substantial evidence did not support the ALJ's RFC or credibility determinations, such renewed contentions are similarly rejected for reasons already stated <u>supra</u>. Further, Russell's contentions that her loss of consciousness significantly eroded her employment base are similarly meritless.

The ALJ determined that, given Russell's RFC for light work, she could perform her

past relevant work as an aide.  T. 19.  As previously discussed, the plaintiff bears the

burden of proof at Step Four that she is unable to perform her past relevant work.

 DeChirico, 134 F.3d at 1179-80 (citing Berry, 675 F.2d at 467).  "[C]laimants are not

disabled when they can perform their past relevant work, either as they actually

performed it, or as it is generally performed in the national economy."  Crofoot v.

Comm. of Soc. Sec., No. 12-CV-521, 2013 WL 5493550, at *12 (N.D.N.Y. Sept. 30,

2013) (citing SSR 82-61, 1982 WL 31387, at *2 (1982); Jock v. Harris, 651 F.2d 133,

135 (2d Cir. 1982)).  The ALJ considered what the Dictionary of Occupational Titles

("DOT") considered as the definition of an aide, which was classified as light work.  T.

19.  The ALJ compared Russell's RFC with the demands of the aide position as

outlined in the DOT and reasonably concluded that Russell could perform her past

relevant work as it was generally performed in the national economy.  T. 19.  It was

Russell's burden to demonstrate that this was not the case.  Russell has failed in

meeting that burden as she has proffered no evidence of such.  As such, the ALJ's

decision should be affirmed.

    Alternatively, the ALJ continued to Step Five, under which he also concluded that

Russell could perform work which existed in significant numbers in the national

economy.  T. 19-20.  Under the Social Security Act, the Commissioner bears the

burden of proof for the final determination of disability.  Pratt v. Chater, 94 F.3d 34, 38

(2d Cir. 1996). Generally speaking, if a claimant suffers only from exertional

impairments, then the Commissioner may satisfy his burden by resorting to the

applicable rule of the Medical–Vocational Guidelines set forth at 20 C.F.R. Part 404,

Subpart P, Appendix 2 (commonly called "the Grids" or the "Grid").[5] Pratt, 94 F.3d at

39. The function of the Grids was succinctly summarized by the court in Zorilla v.

Chater, 915 F.Supp. 662, 667 (S.D.N.Y.1996) as follows:

> In meeting [his] burden of proof on the fifth step of the sequential evaluation process described above, the Commissioner, under appropriate circumstances, may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid." The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the Grid is dispositive on the issue of disability.

Ordinarily, the ALJ need not consult a vocational expert, and may satisfy this burden

"by resorting to the applicable medical vocational guidelines (the grids)". Id. at 78 (citing

20 C.F.R. Pt. 404, Subpt. P, App.2).

The Second Circuit has held that "the mere existence of a nonexertional impairment

does not automatically require the production of a vocational expert or preclude

reliance" on the grids.[6] Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir.1986). The testimony

of a vocational expert that jobs exist in the economy which claimant can obtain and

---

[5] An "exertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (i.e. sitting, standing, walking, lifting, carrying, pushing, and pulling). 20 C.F.R. §§ 404.1569a(b), 416.969a(b); see also Rodriguez v. Apfel, 1998 WL 150981, at *10, n. 12 (S.D.N.Y.1998).

[6] A "nonexertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c). Examples of nonexertional limitations are nervousness, inability to concentrate, difficulties with sight or vision, and an inability to tolerate dust or fumes. 20 C.F.R. §§ 404.1569a(a), (c)(i), (ii), (iv), (v), 416.969a(a), (c)(i), (ii), (iv), (v); see also Rodriguez , 1998 WL 150981, at * 10, n. 12.

perform is required only when "a claimant's nonexertional impairments significantly diminish his ability to work-over and above any incapacity caused solely from exertional limitations-so that he is unable to perform the full range of employment indicated by the medical vocational guidelines." Id. The use of the phrase "significantly diminish" means the "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity". Id. at 606. Under these circumstances, to satisfy his burden at step five, the Commissioner must "introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." Rosa, 168 F.3d at 78 (quoting Bapp, 802 F.2d at 604). Therefore, when considering nonexertional impairments, the ALJ must first consider the question-whether the range of work the plaintiff could perform was so significantly diminished as to require the introduction of vocational testimony. Samuels v. Barnhart, 2003 WL 21108321, at *12 (S.D.N.Y.2003) (holding that the regulations require an ALJ to consider the combined effect of a plaintiff's mental and physical limitations on his work capacity before using the grids).

Here, the ALJ concluded that the testimony of a VE was unnecessary because Russell's occupational base was not significantly eroded. Russell contends that her loss of consciousness should have triggered the need for a VE. As correctly stated by the ALJ, "[a] person with a seizure disorder who is restricted only from being on unprotected elevations and near dangerous moving machinery is an example of someone whose environmental restriction does not have a significant effect on work that exists at all exertional levels." SSR 85-15, 1985 WL 56857, at *8 (1985).

Accordingly, because the occupational base was not significantly diminished by Russell's loss of consciousness, the ALJ was not required to call a VE and properly applied the Grids which directed a finding of not disabled. See Bapp, 802 F.2d at 605-606; 20 C.F.R. pt. 404, subpt. P, App. 1. Therefore, the ALJ's decision should be affirmed.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that Russell's motion for judgment on the pleadings (Dkt. No. 11) be **DENIED** and the Commissioner's decision finding disability be **AFFIRMED**.

Pursuant to 28 U.S.C. §636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989); 28 U.S.C §636(b)(1); FED R. CIV. P. 72, 6(a), 6(e).

It is further **ORDERED** that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Date: September 16, 2014
      Albany, New York

Christian F. Hummel
U.S. Magistrate Judge